[Cite as *State v. Johnson*, 2014-Ohio-657.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. W. Scott Gwin, P.J. |
| Plaintiff-Appellee | : | Hon. Sheila G. Farmer, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 12 CAA 11 0081 |
| | : | |
| CHRISTINA A. JOHNSON | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:          Appeal from the Delaware County Court
of Common Pleas Case No. 12 CR I 01
0014


JUDGMENT:                                          AFFIRMED



DATE OF JUDGMENT ENTRY:          February 20, 2014



APPEARANCES:

For Plaintiff-Appellee:                              For Defendant-Appellant:

CAROL HAMILTON O'BRIEN                    LINDA L. KENDRICK
DELAWARE CO. PROSECUTOR               1488 Silversmith Drive
BRIAN J. WALTER                                   Delaware, OH 43015
140 North Sandusky St.
Delaware, OH 43015

*Delaney, J.*

{¶1}   Appellant Christina A. Johnson appeals from the November 26, 2012 Judgment Entry of Prison Sentence entered in the Delaware County Court of Common Pleas.  Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2}   This case began with multiple scams across multiple states, involving the purchase of motor vehicles from dealerships over the internet using identities stolen from multiple victims.  Car salespeople who testified for appellee in this case indicated internet auto sales make up a significant portion of monthly sales and interstate transactions are not necessarily unusual.  November and December are the busiest months for car sales because customers are spending Christmas money and buying gifts.  Increased sales numbers and holidays also cause paperwork delays which slow down procedures that might otherwise alert salespeople to theft and fraud.

*"Peter Johnson" Buys a Dodge Charger*

{¶3}   In late October or early November of 2011, "Peter Johnson" of Detroit, Michigan contacted Twin Rivers Chrysler Jeep Dodge in Beatrice, Nebraska to inquire about a car he saw on the Twin Rivers website: a white 2011 Dodge Charger with red leather interior, all-wheel drive, and 20-inch chrome wheels, described as a "rather unique vehicle" due to its special features.  David Esker, a salesman at Twin Rivers, was initially skeptical and wondered why a customer in Detroit wanted to buy a Dodge in Nebraska.  Esker also learned from a Dodge "dealer connect" computer program that a similar Dodge Charger was available much closer to Detroit; "Peter Johnson" explained he was aware of that vehicle but its asking price was $3000 higher than Twin

Rivers.'  Esker continued to discuss the Charger with "Johnson" and to negotiate the sale; over the course of 15 or 20 conversations, Esker came to believe the transaction was legitimate.  "Johnson" told Esker he wanted the vehicle as a gift for his wife.  Esker and "Johnson" agreed on a price of $36,262.90, which included delivery of the car to Detroit by employees of Twin Rivers.

{¶4}  Esker obtained the necessary information from "Johnson," including his name, address, date of birth, social security number, telephone numbers, and employment status.  "Johnson's" credit application was submitted to several finance companies and easily processed; he was approved for credit through J.P. Morgan Chase.  The parties planned that Johnson would personally sign the sales and credit paperwork when Twin Rivers employees delivered the Charger in Detroit.

{¶5}  Prior to the delivery, "Johnson" advised his mother was ill so it would be more convenient for the dealership to deliver the car to a McDonald's parking lot off the interstate rather than to his home address in Roseville, a Detroit suburb.  The delivery of the vehicle was accomplished without incident.  Twin Rivers employees delivered the Charger to "Peter Johnson," who matched the photo identification and information in the paperwork provided and "Johnson" signed the paperwork for the transaction.

{¶6}  After the sale, "Johnson" called Esker to report his wife was delighted with the vehicle.  In fact, everything went so smoothly, "Johnson" wanted to purchase a Dodge Durango from Twin Rivers for himself.  Again, the dealership went through the same process without a hitch; this time a Dodge Durango was delivered to "Peter Johnson."

{¶7} Esker customarily sends thank-you letters to everyone who buys a car from him. The first sign of trouble arose when "Johnson's" letter was returned marked undeliverable. Then Twin Rivers attempted to contact "Johnson" to advise he needed to bring his original insurance card into a branch office of the Michigan Secretary of State for registration and transfer purposes; the telephone numbers the dealership had for "Johnson" were no longer in service.

{¶8} Esker contacted every "Peter Johnson" he could find listed in the Detroit area. He also filed stolen vehicle reports with the Beatrice Police Department. The wife of the bona fide Peter Johnson called Esker in response to his correspondence and said she and her husband never bought any cars in Nebraska or authorized such purchases.

{¶9} The Delaware [Ohio] Police Department contacted Esker to tell him the 2011 Dodge Charger had been sold to a dealership in their jurisdiction. The Dodge Durango was never found.

{¶10} The bona fide Peter Robert Johnson now lives in Rochester Hills, Michigan, near Detroit, but his prior address is in Roseville. Around December 11, he received the call from Twin Rivers and followed up with a fraud report. He discovered nine inquiries into his credit from car dealerships and banks; three vehicles were purchased in his name. Two were the Twin Rivers vehicles; another was a Jeep Grand Cherokee Laredo in Wyoming. The credit applications used Johnson's former address and all of his identifying information, with the exception of his physical description. The signature on the purchase paperwork is not his. Car insurance has been taken out in Johnson's name for the stolen vehicles. Johnson initiated security freezes on his credit.

*"Clifford Ansley" Buys a Jeep Grand Cherokee Overland Edition*

{¶11} On December 11, 2011, Peter C. Mueller of Chrysler World, Inc. in Abrams, Wisconsin was contacted by "Clifford Ansley" of the Detroit area in reference to a Jeep Grand Cherokee Overland Edition he saw on the dealership's website. "Ansley" sought the Jeep, described as a "completely loaded vehicle," as a gift for his wife. As with the "Peter Johnson" transactions, "Ansley" provided a photo ID, name, date of birth, social security number, address, and employment history to the Wisconsin dealership. One of the items provided to establish his identity was an electric bill showing the address 909 West Lenawee Street, Lansing, MI, dated December 6, 2011. "Ansley" passed the credit check, was approved for financing through Harris Bank, and Chrysler World delivered the Jeep Overland to him in a suburb of Detroit. Prior to the delivery, "Ansley" called and asked if Chrysler World employees could simply deliver the vehicle somewhere on the street instead of at his residence, "so his wife would be surprised." The Jeep was delivered and "Ansley" signed off on the sales and credit paperwork.

{¶12} Two days after the Jeep delivery, "Ansley" called back, wanting to buy a Chrysler 300 for himself because everything went so smoothly with the Jeep. The process was repeated and Chrysler World delivered a Chrysler 300 to the same spot on the street in a Detroit suburb.

{¶13} Peter Mueller was alerted to the scam when he received a call from Jim Pancake, a car dealer in Delaware, Ohio, stating appellant Christina Anderson was attempting to sell the Jeep Grand Cherokee Overland Edition at his dealership several weeks later.

{¶14} Appellee called the bona fide Clifford Ansley as a witness. Ansley, another victim of identity theft, learned someone used his identity to purchase a Jeep Grand Cherokee Overland Edition, a Chrysler 300, and a 2012 Infinity when someone called him to ask whether he personally sold the Jeep Grand Cherokee Overland Edition to appellant. Ansley did not know appellant and did not authorize or know of the purchase of the vehicles. He has not lived at the address on the electric bill for 12 years. The identifying information provided is his except for the photo and signature.

*A Box of Blank Auto Titles Disappears in Michigan*

{¶15} Appellee filled in another piece of the puzzle with the testimony of branch manager from the Warren, Michigan branch office of the Secretary of State, which serves similar functions to the Ohio Bureau of Motor Vehicles. On or around June 1, 2011, the Warren branch office discovered a box of approximately 2000 blank automobile titles disappeared from its locked, secured facility. The titles are numbered sequentially. Appellee's exhibits 27 [Dodge Charger title] and 28 [Cadillac Escalade title], both found in possession of appellant, bore sequence numbers from the box of stolen titles. Although the titles appeared legitimate because they contained the Secretary of State's watermark, the branch manager noted the titles were missing bar codes, transaction numbers, "Julian dates," and other identifiers of legitimate Michigan auto title.

*Appellant Sells the Dodge Charger at Carriage Towne in Delaware, Ohio*

{¶16} Jim Pancake is the owner of Carriage Towne Chrysler Dodge Jeep in Delaware, Ohio. One of his employees, Eugene Kelly, looks for used cars that can be sold at Carriage Towne. In late December 2011, Kelly told Pancake he knew of a 2011

Dodge Charger with red leather interior someone wanted to sell for around $24,000; Pancake described it as a "hardship case."  Pancake checked on the vehicle through the Chrysler database and learned the car was sold in Detroit to a person named Johnson.  (The database indicates the sales history of the car and its equipment, but, according to Pancake, will not indicate if a car has been stolen.)  Pancake determined the car was worth $21,600 and set up a meeting with the purported owner for December 28, 2011.

{¶17} On that date, appellant came into Carriage Towne.  She had a Michigan title for the car that appeared to be legitimate which indicated she owned the vehicle and no liens existed.  Carriage Towne gave appellant a check for $21,600.  In the meantime, Kelly advised Pancake appellant mentioned she also had a Jeep Grand Cherokee Overland Edition she wanted to sell, which Pancake was very interested in obtaining for the dealership.  He explained the "Overland Edition" is a popular loaded model of the Jeep Grand Cherokee which is difficult to find used.

{¶18} Due to the holidays and the volume of business at the end of the year, paperwork at Carriage Towne was delayed more than usual.  The Dodge Charger paperwork eventually made its way to the local title bureau and the fraudulent Michigan title was immediately detected.  Someone from the B.M.V. called Pancake, who called police.  He also told Kelly the Dodge Charger was stolen, and asked him to try to get appellant to return to Carriage Towne with the Jeep Grand Cherokee Overland Edition so she could be apprehended.

*Appellant Is Arrested in the Midst of another Sales Transaction*

{¶19} On January 4, 2012, appellant appeared at the dealership with the Jeep Grand Cherokee Overland Edition and sat down with Pancake to discuss selling it to him for $36,000. She also mentioned she had a Cadillac Escalade and a Jeep Grand Cherokee Laredo available. In the midst of the transaction, police arrived and arrested her.

{¶20} Appellant asked if she could give her purse to a friend waiting in the Jeep, but the arresting officer took the purse to search it. Inside, he found the Carriage Towne paperwork from the sale of the Dodge Charger, the title for a Cadillac Escalade [appellee's exhibit 28], and business cards from a number of car dealerships.

{¶21} Detective Patrick Gerke of the Delaware City Police Department investigated further. Appellant told Gerke, as she had told Pancake, she didn't have the title and necessary paperwork with her to sell the Jeep Grand Cherokee Overland Edition that day. Gerke secured the Jeep and searched it, and in the glove compartment he found the sales paperwork from Chrysler World, Inc. signed by "Clifford Ansley." Gerke also discovered the dealership window sticker in a pocket on the back of one of the seats inside the Jeep. None of the sales paperwork had appellant's name anywhere on it. The registration of the Jeep was unable to be verified and Gerke determined it was fraudulent.

*Appellant's Changing Stories*

{¶22} The video of Gerke's interview of appellant was played at trial; her explanation of where the vehicles came from and why she was selling them is difficult to follow and the details change when pressed. Appellant told Gerke she bought the

Dodge Charger from Peter Johnson in Michigan and paid $25,000 cash for it. She eventually stated a wholesale car salesperson named "Tone" was the middlemen for the sale. She and her boyfriend Marcus looked at the car together and purchased it with money they had together. Peter Johnson was in the car while she negotiated the sale with "Tone." She had the Charger for a few months but now wanted to sell it to Carriage Towne because she and Marcus split up, and she wanted to buy a Cadillac Escalade on her own.

{¶23} Appellant told Gerke Clifford Ansley sold the Jeep Grand Cherokee Overland Edition to "Tone," who then sold it to appellant; she didn't know Ansley. Gerke repeatedly asked her when she bought the Jeep and she did not answer the question. She said she had no intention of selling the Jeep to Carriage Towne and Pancake started filling out the sales paperwork on his own. Although appellant's story varied in details, she insisted she paid for both the Charger and the Jeep in cash and owned both.

{¶24} Appellee also called Detective Maurier of the Michigan Association for Vehicle Theft Investigators, who interviewed appellant while she was in custody. Most of Maurier's testimony pertained to the 2007 Cadillac Escalade title found in appellant's possession, but also touched upon the other vehicles. Appellant told Maurier she purchased the Dodge Charger in October 2011 for $25,000 and purchased the Jeep Grand Cherokee Overland Edition in December for $20,000 plus a $10,000 Rolex watch.

*The Defense Case*

{¶25} Appellant's brother Jerome Harris testified on her behalf at trial. He said he accompanied her to meet "Tone" at a shopping center to look at the Dodge Charger. Harris' role was to look the car over because appellant considered purchasing it. Harris found no problems with the Charger. "Tone" followed Harris and appellant to the bank and waited while appellant withdrew the cash to purchase the vehicle.

{¶26} Appellant testified on her own behalf. She said she is a real estate broker and a student administrator at Wayne State University, and acknowledged her criminal convictions of felonious assault and child abuse. Appellant testified she purchased the Dodge Charger in November 2011 because her boyfriend Aaron Jackson wanted it. She had received money from a "State Farm settlement" and thus had cash to cover the purchase of the vehicle; Jackson promised to pay her back once he sold a truck. Her brother Jerome accompanied her to a shopping center parking lot where she completed sales paperwork with "Tone." "Tone's" client Peter Johnson, the owner of the car, was also present but appellant did not speak to him. "Tone" followed appellant and her brother to the bank to get the cash.

{¶27} Appellant wanted to buy the Jeep Grand Cherokee Overland Edition from "Tone" for herself. She asked him to hold it for her and gave him her Rolex watch as collateral. Aaron Jackson, in the meantime, was unable to sell his truck to pay her back for the Charger, but he knew of Eugene Kelly, the worker at Carriage Towne, who might be interested in purchasing the vehicle. After Carriage Towne bought the Charger, she took the funds back to Michigan and bought the Jeep Grand Cherokee Overland Edition from "Tone." She was visiting Aaron Jackson in Gahanna for New Year's Eve when

Pancake called and asked if she could stop by to show him the Jeep. She insisted she never had any intention of selling it to him.

{¶28} Appellant claimed to have no idea the vehicles were stolen or that the titles found in her possession were fraudulent.

*Indictment, Trial, and Conviction*

{¶29} Appellant was charged by indictment with two counts of receiving stolen property pursuant to R.C. 2913.51(A), both felonies of the fourth degree, and two counts of forgery pursuant to R.C. 2913.31(A)(3), both felonies of the fifth degree. Counts I and III referred to the 2011 Dodge Charger and its title paperwork; Count II referred to the 2012 Jeep Grand Cherokee Overland Edition; and Count IV referred to the title paperwork for a 2007 Cadillac Escalade.

{¶30} Appellant entered pleas of not guilty and the case proceeded to trial by jury. Appellant was found guilty of Counts I, II, and III and not guilty of Count IV. The trial court found appellant committed the offenses as part of organized criminal activity pursuant to R.C. 2929.13(B)(2) and sentenced her to consecutive prison terms of 12 months each on Counts I and II, to be served concurrently with a term of 12 months on Count III.

{¶31} Appellant now appeals from the November 26, 2012 judgment entry of her convictions and sentence. Original appellate counsel filed an *Anders* brief. On August 8, 2013, we found the manifest weight argument not to be frivolous, ruled *Anders* no longer applied, and remanded to the trial court for appointment of new appellate counsel. The instant appeal resulted.

{¶32} Appellant raises two assignments of error:

## ASSIGNMENTS OF ERROR

{¶33} "I. THE DEFENDANT WAS DENIED DUE PROCESS BECAUSE SHE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL."

{¶34} "II. DEFENDANTS CONVICYION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]" (*sic throughout.*)

## ANALYSIS

### I.

{¶35} In her first assignment of error, appellant argues she did not receive effective assistance of counsel because defense trial counsel failed to subpoena a witness on her behalf.

{¶36} To succeed on a claim of ineffectiveness, a defendant must satisfy a two-prong test. Initially, a defendant must show that trial counsel acted incompetently. *See*, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). In assessing such claims, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. The question is whether counsel acted "outside the wide range of professionally competent assistance." *Id.* at 690.

{¶37} Even if a defendant shows that counsel was incompetent, the defendant must then satisfy the second prong of the *Strickland* test. Under this "actual prejudice" prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

{¶38} Appellant argues defense trial counsel was ineffective in failing to call a witness to lay a foundation to support evidence of her alleged insurance settlement from State Farm.  Appellant claimed the settlement provided the cash for her vehicle purchases from "Tone."  The decision not to focus on the alleged insurance settlement is a reasonable trial tactic.  Trial tactics do not generally constitute ineffective assistance of counsel. See, *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). It is generally presumed that failing to call witnesses is a tactical, trial strategy and does not necessarily constitute ineffective assistance of counsel. *State v. Coulter*, 75 Ohio App.3d 219, 230, 598 N.E.2d 1324 (12th Dist.1992); *State v. Hunt*, 20 Ohio App.3d 310, 312, 486 N.E.2d 108 (9th Dist.1984), citing *O'Malley v. United States*, 285 F.2d 733 (6th Cir.1961).

{¶39} Appellant argues defense trial counsel did not employ a strategic tactic in failing to offer a witness to the insurance settlement.  Instead, she argues, counsel simply omitted the evidence when the trial court indicated such evidence would be hearsay.  It is highly speculative what type of witness would have enabled the exhibit to come in because the authenticity of the document was in question.  Even if counsel had called a foundational witness, it is not clear from the record the exhibit would have been admitted.

{¶40} Moreover, we will not find counsel was ineffective based upon speculation; even if the exhibit was admitted, there is no reason to believe, nor does appellant argue, the outcome of the trial would have been different.  Appellant argues an unidentified foundational witness would have enabled introduction of the insurance settlement to support her argument that she had the funds available to pay for the cars. The source of the cash for the purchases is irrelevant, however, to whether appellant knew or should have known the vehicle were stolen and the titles were fraudulent, especially in light of so many other obvious inconsistencies.

{¶41} Appellant has shown neither that trial counsel was incompetent nor that she suffered actual prejudice.  Her first assignment of error is therefore overruled.

II.

{¶42} In her second assignment of error, appellant contends her convictions for receiving stolen property[1] are against the manifest weight of the evidence.  We disagree.

{¶43} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered."  *State v. Thompkins*, supra, 78 Ohio St.3d at 387.  Reversing a conviction as being against the manifest weight of the

---

[1] Appellant does not argue her conviction upon one count of forgery is against the manifest weight of the evidence.

evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶44} Appellant was convicted upon two counts of receiving stolen property pursuant to R.C. 2913.51(A), which states, "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Appellant contends the jury lost its way in concluding she knew or had reasonable cause to know the vehicles at issue were obtained through the commission of a theft offense. On this point, the trial court instructed the jury as follows:

> In determining whether the defendant had reasonable cause to believe the motor vehicle was obtained through a theft offense, you must put yourself in the position of this defendant with her knowledge and lack of knowledge under the circumstances and conditions that surround her at that time. You must consider the conduct of the persons involved and determine if their acts and words and all the surrounding circumstances would have caused a person of ordinary prudence and care to believe that the motor vehicle had been obtained through the commission of a theft offense. (T. 562-563).

{¶45} Appellee presented evidence from which the jury might readily infer appellant knew the Dodge Charger and Jeep Grand Cherokee Overland Edition were stolen, including the fraudulent titles, the false registrations, the out-of-state temporary tags, the sales paperwork in the name of "Clifford Ansley" in the glove compartment,

and the dealer window sticker in the seat pocket. Even more compelling, however, is appellant's own description of her conduct and the circumstances surrounding her possession of these vehicles and titles. If we accept appellant's story at trial, she bought two valuable vehicles in cash from a middleman for no clear reason, in parking lot transactions. The middleman followed her to a bank to get the cash. One vehicle still bore Wisconsin temporary tags. Appellant's stories varied in minor but striking key details, such as who she was dating, where she worked, why she was shopping for a car through "Tone," and each version made little sense. Most telling as to her criminal culpability, however, was her simple inability in her interview to tell Gerke when she bought the Jeep, followed by her vague statements that she owned it for "a few months," when in fact the Jeep had been stolen from Wisconsin only weeks earlier.

{¶46} We cannot find the jury clearly lost its way and created a manifest miscarriage of justice in convicting appellant of two counts of receiving stolen property because appellee's evidence was thorough, credible, and consistently established appellant knew or had reasonable cause to believe the vehicles were stolen. Appellant's convictions for receiving stolen property are not against the manifest weight of the evidence and her second assignment of error is therefore overruled.

## CONCLUSION

{¶47} Appellant's two assignments of error are overruled and the judgment of the Delaware County Court of Common Pleas is affirmed.

By: Delaney, J. and

Gwin, P.J.

Farmer, J., concur.